**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
)
FPL GROUP, INC.,                     )
)
        **Plaintiff,**            )
)
        **v.**                    )         **Civil Action No. 09-652 (ESH)**
)
INTERNAL REVENUE SERVICE,     )
)
        **Defendant.**        )
_____)

## MEMORANDUM OPINION

Plaintiff FPL Group, Inc. ("FPL Group") has brought this action against the Internal

Revenue Service ("IRS," "the Service," or "the agency") under the Freedom of Information Act

("FOIA"), 5 U.S.C. § 552, and the Internal Revenue Code ("IRC"), 26 U.S.C. § 6110. FPL

Group seeks to compel disclosure of IRS documents related to determinations regarding its

ability to take certain deductions on the consolidated tax returns that it filed on behalf of its

subsidiary corporations. After searching its records, the IRS identified 15,845 responsive

documents, of which it produced 2,153 pages in their entirety, withheld 12,584 pages, and

produced 1,108 pages in redacted form. The IRS now moves for summary judgment as to those

documents which it has redacted or withheld entirely, and plaintiff cross-moves for summary

judgment. The parties agree that certain issues are no longer disputed, and the only questions

remaining before the Court are (1) whether the IRS performed an adequate, good faith search in

response to plaintiff's requests, and (2) whether the IRS has established that it properly invoked

the deliberative process, attorney work product, and attorney-client privileges to withhold or

redact certain responsive documents. Upon consideration of the parties' submissions and the

entire record, and for the reasons discussed herein, defendant's motion will be granted in part

and denied in part, plaintiff's motion will be denied in part, and defendant will be required to supplement its declarations and produce certain documents for *in camera* review.

## BACKGROUND

Plaintiff is a Florida corporation and parent of an affiliated group of corporations that includes the wholly-owned subsidiary Florida Power & Light Co. ("Florida Power"). (Def.'s Statement of Material Facts ("Def.'s SMF") in Supp. of Mot. for Summ. J. ("Def.'s SJ Mot.") ¶ 2.) This FOIA request arises from plaintiff's long-running dispute with the IRS, culminating in litigation in the Tax Court, over the Service's refusal to let plaintiff characterize certain tax deductions as repair expenses rather than capital expenditures ("the Tax Court case"). *See, e.g.*, *FPL Group, Inc. v. Comm'r* ("*FPL Group I*"), 115 T.C. 554, 555 (2000); *FPL Group, Inc. v. Comm'r* ("*FPL Group II*"), No. 5271-96, 2005 WL 2159680 (Tax Ct. Sept. 8, 2005); *FPL Group, Inc. v. Comm'r* ("*FPL Group III*"), Nos. 5271-96, 6653-00, 10811-00, 2008 WL 2199696 (Tax Ct. May 28, 2008).[1]

## I.     THE TAX COURT CASE

As explained in *FPL Group I*, during the taxable years 1988 through 1992, "Florida Power incurred substantial costs related to its electric plants. The expenditures for these costs were recorded as either capital expenditures or repair expenses for regulatory accounting and financial reporting purposes. In preparing its tax returns for the years in issue, petitioner used the same characterization of expenditures for tax reporting purposes that Florida Power did for regulatory accounting and financial purposes." 115 T.C. at 558. In 1995, the IRS issued

---

[1] The characterization of the deductions was relevant because "whether an expenditure constitutes a capital expenditure or a currently deductible expense involves the question of the proper time for taking a deduction," since "business expenses are currently deductible, [but] a capital expenditure usually is amortized and depreciated over the life of the relevant asset." *FPL Group I*, 115 T.C. at 562 (quotation marks omitted).

plaintiff a notice of deficiency for those five tax years. *Id.* at 555. In the Tax Court, plaintiff argued that it had erroneously characterized some repair expenses as capital expenses and sought an adjustment in the deficiency amount. *Id.* The IRS responded that plaintiff's attempted recharacterization constituted a statutorily impermissible change in plaintiff's "method of accounting," because plaintiff had not previously sought the Service's consent. *Id.* at 560. In 2000, the Tax Court found that without the agency's consent, plaintiff was "retroactively attempting to recharacterize expenditures that it regularly and consistently capitalized for regulatory, financial, and tax reporting purposes" without the agency's consent, *id.* at 570, 573, and thus granted the Service partial summary judgment on this issue. *Id.* at 575-76.

Subsequently, by letter dated April 10, 2001, plaintiff submitted a "protective request" to IRS Associate Area Counsel Donald Williamson for permission to change its method of accounting for the relevant tax years. (Pl.'s Opp'n to Def.'s SJ Mot. & Mem. in Supp. of Cross-Mot. for Summ. J. ("Pl.'s Opp'n"), Second Decl. of James Dawson ("2nd Dawson Decl."), Ex. G (protective request letter) at 2.) Williamson, who supervised the Tax Court case and was based in Atlanta, Georgia, denied the request by letter dated December 17, 2001. (*Id.*, Ex. J ("2001 Williamson Denial").) The denial letter nonetheless encouraged plaintiff to contact the "Examination team" to work towards an agreement "as to which plaintiff items should be expensed and which items should be capitalized." (*Id.* at 1-2.)

Following Williamson's retirement in 2002, the litigation was assigned to Chicago-based attorney manager William Merkle of the Office of Division Counsel, Large and Mid-Size Business Division ("LMSB"). (Def.'s SMF ¶ 9; Def.'s SJ Mot., Decl. of William Merkle ("Merkle Decl.") ¶ 4.) Around that time, the legal and administrative files for the Tax Court case were transferred from Williamson's Atlanta office to Merkle's Chicago office. (Merkle Decl. ¶

4.) Lead counsel in the Tax Court case was Lawrence Letkewicz, a trial attorney supervised by Merkle. (Def.'s SMF ¶¶ 9-10.) The Service's audit team included revenue agents Sara Northard, Kathleen Baryza, and Larry Clarke; the audit team's legal counsel was Sergio Garcia-Pages. (Pl.'s Statement of Material Facts in Supp. of Cross-Mot. for Summ. J. ("Pl.'s SMF") ¶¶ 31, 41; Pl.'s Reply to Def.'s Reply & Reply in Supp. of Cross-Mot. for Summ. J. ("Pl.'s Sur-reply") at 10.)

In June 2002, Merkle and plaintiff's counsel Robert Carney began to explore a possible resolution regarding "which of certain expenditures should be capitalized and which should be currently deductible as repairs . . . ." *FPL Group III*, 2008 WL 2199696, at \*1-\*2. Although only Merkle had the authority to settle the repairs issue, Merkle's subordinate, Robert Shilliday, was assigned to negotiate on the Service's behalf. *Id.* at \*2. Throughout 2002, Shilliday discussed various alternative methodologies with plaintiff's counsel, and the parties concluded that "the major component methodology" for classifying whether a replaced piece of equipment was a repair expense or capital expense "had the most promise for settlement." *Id.* However, in April 2003, Merkle advised Carney that the agency would not settle the repairs issue that was the subject of *FPL Group I*, and subsequently, various agency constituencies indicated to Merkle that they opposed settling the remaining issues as well. *See id.* at \*7-\*8. Plaintiff later argued that it had entered an enforceable settlement agreement with the agency, but the Tax Court rejected this argument in May 2008. *See id.* at \*13.

## II.    THE INDUSTRY ISSUE RESOLUTION PROCESS

IRS revenue procedures provide for an Industry Issue Resolution ("IIR") program, whose objective "is to identify frequently disputed or burdensome tax issues that are common to a significant number of business taxpayers" and which "may be resolved through published or other administrative guidance," Rev. Proc. 2003-36 § 1, 2003 WL 1894524 (May 5, 2003), rather

than post-filing examination. (2nd Dawson Decl. ¶ 50.) "Interested parties" can initiate the IIR process by requesting that the Service consider a given issue for development and inclusion on a "Guidance Priority List," Rev. Proc. 2003-36 § 4.01, guided by factors such as "whether the requested guidance promotes sound tax administration." *Id.* § 4.02. Once an issue has been selected "as a published guidance project," an IIR team, consisting of agency counsel and other employees, is formed to provide analytical assistance. *Id.* § 6.01. The IIR team may request that private entities voluntarily participate and submit information to assist the team's analysis. *Id.* § 6.02.

In 2002, following a request by the Edison Electric Institute ("EEI"), which is a utility industry association, the Service initiated the IIR process to provide guidance on the "deduction and capitalization of costs incurred by utilities for assets used for power generation," and whether such incurred costs "are expenditures to maintain assets or capital improvements." IRS News Release 2002-89, 2002 WL 1492975 (July 10, 2002). (*See also* 2nd Dawson Decl., Ex. V.) According to defendant, this IIR process was "the precursor" to the process of developing a revenue ruling (Def.'s Reply in Supp. of SJ Mot. & Cross-Opp'n to Pl.'s Cross-Mot. for Summ. J. ("Def.'s Reply") at 12), which defendant defines as "an official interpretation by the Service of the Internal Revenue Code, related statutes, and regulations on how the law is applied to a specific set of facts." (Def.'s SJ Mot., Second Decl. of Matthew Cooper ("2nd Cooper Decl.") ¶ 35; *accord* Def.'s Reply at 9.) IRS attorneys Merrill Feldstein and Kimberly Koch were "primarily responsible" for drafting "the proposed guidance resulting from the IIR process." (2nd Cooper Decl. ¶ 8.) Feldstein and Koch were attorneys in the section of the Office of Chief Counsel ("OCC") "that currently has jurisdiction over tax accounting issues, including whether an item should be treated as capitalized costs or deductible repair." (*Id.*) The IIR team,

consisting of Department of Treasury ("Treasury") and IRS personnel, "conducted fact-finding discussions with representatives of the utility industry" and invited their feedback. (*Id.* ¶ 34; Def.'s Reply, Third Decl. of Matthew Cooper ("3rd Cooper Decl.") ¶ 16; *see also* Def.'s Reply at 12; Pl.'s Opp'n at 29-30.) At least one industry representative, EEI, also offered the agency legal analysis in response to its questions. (*See* 2nd Dawson Decl., Ex. W (responses to questions 3, 4a, 12a, 12b, and 16).)

In 2005, after several years were spent "developing a proposed revenue ruling," executives in Treasury and the IRS Chief Counsel's office decided to end the revenue ruling process and work instead on proposed 2006 regulations for the capitalization of expenditures related to tangible assets. (2nd Cooper Decl. ¶ 32; *see also* Pl.'s Opp'n at 30-31.) The proposed revenue ruling was never published because defendant "decided to roll the IIR project into the proposed tangible regulations." (Pl.'s SMF ¶ 90; Def.'s Resp. to Pl.'s SMF ¶ 90.) Feldstein and Koch also appear to have been the principal drafters of these "proposed regulations regarding the capitalization of repair expense issue." (2nd Cooper Decl. ¶ 8.)

## III.    THE FOIA REQUESTS

### A.    Plaintiff's Requests

On April 7, 2008, plaintiff submitted a request for records under FOIA ("the FOIA request") to the IRS National Office, as well as the Service's FOIA disclosure offices in Chicago; Cincinnati, Ohio; and Jacksonville, Florida. (Pl.'s SMF ¶¶ 1, 3; *see* Compl., Ex. D ("FOIA Request").) The FOIA request sought eight categories of items related to IRS audit determinations regarding the method of accounting for expenditures on repairs to Florida Power's electric generation equipment:

> (1) "[d]ocuments related specifically to the reasons for, or factual considerations in connection with," Williamson's determination not to allow Florida Power's

April 10, 2001 protective request "for a change in the method of accounting for items of repair expense";

(2) "[a]ny and all directives to Revenue Agents (whether direct or indirect) regarding the disallowance of deductions of repair expenses in excess of the amounts claimed for financial accounting purposes" on Florida Power's consolidated tax returns;

(3) "[a]ny documents related to a final decision or basis for the final decision," "including the background files supporting the decision," not to allow Florida Power's 2001 request for a protective change in the method of accounting for repair item expenses;

(4) affidavits by Williamson and Northard that were described by Williamson in a May 30, 2002 letter, "along with any other files or factual background relating to the affidavits";

(5) "[t]he statement of final decision" (and background files supporting that decision, including studies or analyses by IRS employees or outside contractors on the agency's behalf) regarding the IIR process entitled "Costs of Maintaining and Improving Power Generating Assets" (reference number RR-108668-03), which related to repair expenses and capitalization;

(6) "[a]ny documents submitted by members of the electric utility industry" who participated in the IIR process;

(7) "[a]ll documents and records" related to the 2006 promulgation of proposed regulations regarding the capitalization of repair expenses; and

(8) "[a]l documents" containing the results of certain studies by IRS representatives or outside contractors.

(*See* FOIA Request at 2-3.)  The FOIA request specified that the documents sought could "likely

be located" in the following offices or with certain individuals who had worked on the FPL tax

litigation or other issues related to Florida Power:

- the IRS National Office;

- the office of the LMSB Division's Associate Chief Counsel;

- Frank Genet, an agency technical advisor, or the agency's utility industry group in Akron, Ohio;

- Merkle and James Lanning, or the Service's counsel office in Chicago;

- Garcia-Pages, or the Service's counsel office in Miami, Florida; and

- Ben DeLuna, or the Service's counsel office in Jacksonville, Florida.

(*Id.* at 1.)

That same day, plaintiff submitted a separate request under IRC § 6110 ("the first IRC request") for "background file documents" relating to "the preparation and issuance of written determinations designated as PLR 199903030 and AM 2006-006," including emails and telephone conferences notes. (Compl., Ex. B at 9 ("1st IRC Request").)

The next day, April 8, 2008, plaintiff submitted a second request under IRC § 6110 ("the second IRC request") for all "Chief Counsel Advice" relating to any IRS National Office directions regarding "the required treatment of items of cost as capitalized costs or deductible repairs for the consolidated returns" of FPL Group, including emails and telephone conference notes. (Compl., Ex. C ("2nd IRC Request") at 1.) This second IRC request was also defined to include materials sought by the FOIA request that might be subject to disclosure under the IRC rather than FOIA. (*Id.*)

**B.    Defendant's Responses**

**1.    Pre-Litigation Search**

In early June 2008, Brenda Ball and Janice Rudolph of the agency's disclosure offices in Jacksonville, Florida and Lanham, Maryland, respectively, began working on plaintiff's FOIA requests. (*See* Pl.'s SMF ¶ 9; Def.'s SMF ¶¶ 6, 13.) Ball reviewed agency records that referenced plaintiff's extensive audit and litigation history, and she contacted the individuals identified in the FOIA request, as well as Letkewicz, who had served as lead counsel in the Tax Court case. (Def.'s SMF ¶ 14; *see* Def.'s SJ Mot., Decl. of Brenda Ball ("Ball Decl.") ¶ 6.) On June 4, plaintiff's counsel James Dawson spoke with Ball and learned that she was working on

the FOIA request and coordinating with Rudolph and the National Office.[2]  (Pl.'s SMF ¶ 9; *see* Pl.'s Opp'n to Def.'s Mot. for Prot. Order ("Pl.'s Prot. Order Opp'n"), Decl. of James Dawson ("1st Dawson Decl.") ¶ 2; *see also* Def.'s SMF ¶ 13.)  Ball explained to Dawson that she would be handling all items of the FOIA request except Item 7.  (Def.'s SMF ¶ 14.)  A week later on June 13, Ball informed Dawson that she had contacted the IRS counsel's Chicago office; sent emails to Garcia-Pages, Letkewicz, and Merkle; and contacted Genet, who told her that he was cleaning up his office and that any possibly responsive documents had already been destroyed. (Pl.'s SMF ¶ 10; *see* 1st Dawson Decl. ¶ 3.)[3]  Thereafter, Ball received responsive documents from Letkewicz (on behalf of Merkle's office), from "other [IRS] employees," and from her requests pursuant to a search of plaintiff's tax return identification numbers.  (Ball Decl. ¶ 7; Merkle Decl. ¶ 8.)  Ball reviewed those documents for withholdings and redactions.  (Ball Decl. ¶ 7.)

On July 31, 2008, defendant wrote to plaintiff regarding the second IRC request.  (*See* Pl.'s Opp'n, Decl. of James Dawson ("2nd Dawson Decl."), Ex. C.)  The letter stated that defendant was busy developing internal record-keeping measures to implement the D.C. Circuit's ruling in *Tax Analysts v. IRS* ("*Tax Analysts III*"), 495 F.3d 676 (D.C. Cir. 2007) (holding that informal advice emailed by attorneys in IRS OCC to field personnel constitutes Chief Counsel Advice that must be disclosed under IRC § 6110).  (*See* 2nd Dawson Decl., Ex. C

---

[2] Defendant disputes this statement as hearsay (*see* Def.'s Resp. to Pl.'s SMF ¶ 9), but the Court concludes that Ball's statement is not hearsay but a party-opponent admission.  *See* Fed. R. Evid. 801(d)(2)(D) (statement by party's employee "concerning a matter within the scope of the . . . employment").

[3] Again, defendant disputes this statement as hearsay, but as noted, Ball's statement constitutes an admission by a party-opponent.  *See supra* note 2.  Defendant's only other objection to this statement is that it should not be interpreted to mean that Genet destroyed the records after learning of plaintiff's FOIA request; however, defendant does not dispute the *fact* of the destruction.  (Def.'s Resp. to Pl.'s SMF ¶ 10.)

at 2.) Defendant explained that as a result, the agency was presently "unable to divert its attention from this effort, which [was] under the court's supervision, in an effort to isolate any email" that may have been responsive to the second IRC request. (*Id.*)

On August 6, 2008, Ball informed Dawson that defendant was sending plaintiff some documents, but also that "she was 'not getting responses from her requests.'" (1st Dawson Decl. ¶ 4; Pl.'s SMF ¶ 12.)[4] By letter dated August 8, 2008, plaintiff received a total of 318 pages from Ball. (*See* Ball Decl., Ex. A at 2.) These pages were responsive only to Items 1, 3, and 4 of the FOIA request, because Ball had "found no documents specifically responsive" to Items 2, 5, 6, or 8, and because the National Office would address Item 7. (*Id.*, Ex. B at 1-2; *see also* Pl.'s SMF ¶ 13.)[5]

By letter dated September 3, 2008, defendant informed plaintiff that all documents responsive to the first IRC request for written determination PLR 199903030 were destroyed pursuant to record retention procedures. (*See* Def.'s SJ Mot., First Decl. of Matthew Cooper ("1st Cooper Decl."), Ex. A.) Several months later, by letter dated February 9, 2009, defendant responded to the first IRC request for background documents related to AM 2006-006. (Pl.'s SMF ¶ 16; *see* 2nd Dawson Decl., Ex. D.) The letter explained that no responsive documents had been found under the IRC, but defendant nonetheless located 375 pages that were responsive under FOIA. (2nd Dawson Decl., Ex. D at 1-2.) Of these, 299 were withheld in full under various FOIA exemptions; 39 pages were disclosed in full, including the AM 2006-006 memorandum and various emails; and 36 pages of emails were disclosed with various privilege

---

[4] Again, while defendant disputes this statement as hearsay (Def.'s Resp. to Pl.'s SMF ¶ 12), Ball is a party-opponent who purportedly said this to Dawson, plaintiff's agent. *See supra* note 2. Defendant does not otherwise dispute the fact of this statement, just its materiality.

[5] Although the Ball letter explains that 318 pages were produced, plaintiff suggests that it received 330 pages. (1st Dawson Decl. ¶ 5.)

redactions under Exemptions 5 and 6.  (*Id.*; Pl.'s SMF ¶¶ 16-18.)  The letter also explained that the remainder of plaintiff's request would likely be provided on or before April 14.  (2nd Dawson Decl., Ex. D at 2.)

### 2. Post-Litigation Search

Plaintiff filed this action on April 9, 2009.  Counts I through III correspond to plaintiff's first IRC request, the second IRC request, and the FOIA request, respectively.

In May 2009, defendant assigned Matthew Cooper of the Office of the Associate Chief Counsel to assist with this lawsuit's defense.  (2nd Cooper Decl. ¶¶ 1-2.)  Cooper learned that before plaintiff filed suit, defendant had located but not yet finished reviewing documents responsive to Items 5-7 of the FOIA request.  (*Id.* ¶ 9.)  Cooper "took over the review and completion of the processing" of those responsive documents and initiated a further search for electronic records responsive to Items 1-3.  (*Id.* ¶ 10.)

By email dated July 31, 2009, plaintiff's counsel Carney informed defendant's counsel Carmen Banerjee that plaintiff knew of at least seven boxes of potentially responsive documents in defendant's Chicago offices, based upon a 2003 email from Letkewicz to Merkle and Shilliday.  (Pl.'s Prot. Order Opp'n, Decl. Of Robert Carney ("1st Carney Decl.") ¶¶ 5, 13; *see id.*, Ex. B; *see also* Pl.'s SMF ¶ 110; 2nd Cooper Decl. ¶ 11.)[6]  Cooper then instructed Merkle's office to conduct "a new search of [the] FPL files and provide any additional documents that [were] potentially responsive" to Items 1-3 of the FOIA request.  (Merkle Decl. ¶ 9.)  From September 10 through October 7, the Chicago office searched "all 73 boxes of legal and administrative files" for FPL's prior litigation and "all electronic files, e-mails, and personal

---

[6] In addition to disputing the materiality of this fact, defendant also objects to plaintiff's reliance upon Carney's exchange with Banerjee under Federal Rule of Evidence 408(a), because their discussions were part of an effort to negotiate an end to the litigation.  (*See* Def.'s Resp. to Pl.'s SMF ¶¶ 109-126.)  The Court rejects the Rule's applicability in this particular context.

notes files" belonging to attorneys under Merkle's management "who had litigated any FPL matters since 2002 . . . ." (*Id.* ¶¶ 10-11.) Materials responsive to Items 1-3 were located and forwarded to Cooper. (*Id.* ¶¶ 10-12.) Cooper also contacted other IRS personnel including Clarke and Garcia-Pages of the audit team, and he received additional documents responsive to Items 1-4 from Garcia-Pages and the IRS counsel's office in Jacksonville. (2nd Cooper Decl. ¶ 12; 3rd Cooper Decl. ¶ 9.)

From August through November 2009, defendant provided plaintiff with several thousand more pages that were responsive to both the FOIA and IRC requests. (*See* Def.'s Reply, First Decl. of Carmen Banerjee ("1st Banerjee Decl.") ¶¶ 2-7 & Exs. A-H; *id.*, Second Decl. of Carmen Banerjee ¶¶ 2-3 & Exs. A-B.) Those documents were accompanied by two declarations by Cooper. (1st Banerjee Decl. ¶¶ 3, 6; *see* 1st Cooper Decl. & 2nd Cooper Decl.) Cooper's declarations set forth the number of pages located and deemed responsive after plaintiff filed this suit, general descriptions of the withheld or redacted documents, the FOIA exemptions and privileges that had been invoked to justify the withholdings or redactions, and more detailed descriptions of withheld documents. According to the numbers that Cooper provided, 15,845 pages were deemed responsive to plaintiff's requests, 12,584 pages were withheld in full, 2,153 pages were released in full, and 1,108 pages were released with redactions, as detailed in the following table:[7]

---

[7] The Court created this table after an exhaustive review of the haphazardly presented record.

| Request | Responsive | Withheld | Released in Full | Redacted |
|---|---|---|---|---|
| ***FOIA (pre-litigation)*** | | | | |
| Items 1, 3, & 4 | 318 | 0 | 318 | 0 |
| Items 2, 5-8 | 0 | 0 | 0 | 0 |
| ***FOIA (post-litigation)***[8] | | | | |
| Items 1 & 3 | 51 | 0 | 50 (or 51) | 1 (or 0) |
| Item 2 | 0 | 0 | 0 | 0 |
| Item 4 | 58 | 0 | 58 (or 57) | 0 (or 1) |
| Items 5 & 6 | 2,059 | 908 | 888 | 263 |
| Item 7 | 12,661 | 11,112 | 744 | 805 |
| Item 8 | 0 | 0 | 0 | 0 |
| ***IRC (pre- and post-litigation)*** | | | | |
| First request | | | | |
| PLR 199903030[9] | 11 | 2 | 9 | 0 |
| AM 2006-006[10] | 375 | 297 | 39 | 39 |
| Second request | 312 | 265[11] | 47 | 0 |
| **Total Documents** | **15,845** | **12,584** | **2,153** | **1,108** |

(*See* 1st Cooper Decl. ¶¶ 9, 14-15, 26 (IRC requests); 2nd Cooper Decl. ¶¶ 12-16, 32 (FOIA request).)

---

[8] The second Cooper declaration states only that one of the 109 pages responsive to Items 1, 3, and 4 was redacted, but he does not specify the item to which the redacted page was responsive. (*See* 2nd Cooper Decl. ¶ 15.) The Court's tabulations for Items 1, 3, and 4 reflect this uncertainty.

[9] Despite the fact that plaintiff was informed in 2008 that documents responsive to the PLR 199903030 request had been destroyed, Cooper's post-litigation search uncovered that Feldstein possessed 11 responsive documents. (*See* 1st Cooper Decl. ¶¶ 8-9.)

[10] After defendant informed plaintiff that 299 pages were being withheld in full, Cooper determined that one of those pages should be released as a background file document under IRC § 6110, and another that was withheld under FOIA should be released with redactions. (1st Cooper Decl. ¶ 15.) The Court's tabulations reflect this change.

[11] Although Cooper's first declaration indicates that 265 pages are being withheld (1st Cooper Decl. ¶¶ 26, 28 (discussing control numbers CII001-CII032 and CII078-CII310), his second declaration suggests that only 251 pages are being withheld. (*See* 2nd Cooper Decl. ¶ 45 (CII001-CII032, CII078-CII142, and CII157-CII310).)

## C.     The Instant Motions

Defendant now moves for summary judgment, arguing that it has satisfied its disclosure obligations.  Plaintiff cross-moves for summary judgment.  Some of the disclosures are no longer in dispute, but plaintiff continues to take issue with defendant's responses to the first IRC request as to AM 2006-006, the second IRC request as to numerous emails, and the FOIA request as to Items 1, 2, 3, 5, and 6.  (*See* Pl.'s Sur-reply at 2.)  Specifically, plaintiff argues that defendant (1) conducted an inadequate search for responsive documents, particularly with respect to FOIA request Items 1-3; (2) improperly invoked the deliberative process, attorney work product, and attorney-client privileges under FOIA Exemption 5 to withhold or redact documents responsive to the IRC requests and FOIA request Items 5 and 6; and (3) failed to comply with the requirement that all "reasonably segregable" portions of otherwise privileged records be disclosed.  *See* 5 U.S.C. § 552(b).

## ANALYSIS

## I.     STANDARD OF REVIEW

The Court may grant a motion for summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the burden of demonstrating an absence of a genuine issue of material fact in dispute.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Factual assertions in the moving party's affidavits may be accepted as true unless the opposing party submits his own affidavits or declarations or documentary evidence to the contrary.  *Neal v. Kelly*, 963 F.2d 453, 456 (D.C. Cir. 1992).

The parties agree that FOIA's standards govern the remaining claims.  (See Pl.'s Opp'n at

39; Def.'s Reply at 23.) "FOIA cases typically and appropriately are decided on motions for summary judgment." *Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009) (citations omitted). "In a FOIA case, summary judgment may be granted to the government if 'the agency proves that it has fully discharged its obligations under the FOIA, after the underlying facts and the inferences to be drawn from them are construed in the light most favorable to the FOIA requester.'" *Fischer v. Dep't of Justice*, 596 F. Supp. 2d 34, 42 (D.D.C. 2009) (quoting *Greenberg v. U.S. Dep't of Treasury*, 10 F. Supp. 2d 3, 11 (D.D.C. 1998)). The requester may challenge such a showing by "set[ting] out specific facts showing a genuine issue for trial," Fed. R. Civ. P. 56(e), that would permit a reasonable jury to find in his favor. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir.1987). However, agency affidavits "are afforded a presumption of good faith," and an adequate affidavit "can be rebutted only 'with evidence that the agency's search was not made in good faith.'" *Defenders of Wildlife v. U.S. Dep't of Interior*, 314 F. Supp. 2d 1, 8 (D.D.C. 2004) (quoting *Trans Union LLC v. Fed. Trade Comm'n*, 141 F. Supp. 2d 62, 69 (D.D.C. 2001)). In other words, a requester cannot rebut the good faith presumption through "'purely speculative claims about the existence and discoverability of other documents.'" *SafeCard Servs., Inc. v. Sec. & Exch. Comm'n*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quoting *Ground Saucer Watch, Inc. v. Cent. Intelligence Agency*, 692 F.2d 770, 771 (D.C. Cir. 1981)). But "if the sufficiency of the agency's identification or retrieval procedure is genuinely in issue, summary judgment is not in order." *Weisberg v. U.S. Dep't of Justice*, 627 F.2d 365, 370 (D.C. Cir. 1980).

## II.    ADEQUACY OF SEARCH

Defendant argues that "it conducted its searches within the four corners of each request, employed several methodologies in conducting its searches, and thereby conducted reasonable searches."  (Def.'s Reply at 2; *see also* Def.'s Mot. at 6-8.)  Indeed, Ball and Cooper's declarations go into extensive detail about the methodology and scope of defendant's pre- and post-litigation searches.  Nonetheless, plaintiff contends that defendant failed to conduct a reasonable and good faith search for responsive documents both before and after this litigation commenced.  Based on the undisputed evidence and applicable legal principles, the Court is persuaded by some of plaintiff's arguments.

"[T]he adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search."  *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003).  The Court applies a "'reasonableness' test to determine the 'adequacy' of search methodology," *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 27 (D.C. Cir. 1998), and requires a "reasonable and systematic approach to locating the requested documents . . . ."  *Center for Pub. Integrity v. FCC*, 505 F. Supp. 2d 106, 116 (D.D.C. 2007).  "The agency must demonstrate that it 'made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested.'"  *Fischer*, 596 F. Supp. at 42 (quoting *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)).

Plaintiff first argues that defendant incorrectly interpreted Items 1-3 so as to exclude settlement-related documents as non-responsive.  Plaintiff contends that it obtained "numerous emails" during discovery in the Tax Court case which should have been located in defendant's Chicago office as responsive to the FOIA request.  (Pl.'s Opp'n at 15-16.)  Because these emails

were not produced (nor do they appear in Cooper's privilege log), plaintiff argues that this is

"proof that the search was neither reasonable nor in good faith." (*Id.* at 16.) As evidence,

plaintiff cites six emails related to the agency's rejection of a settlement proposal. (*See* 2nd

Dawson Decl. ¶¶ 27-37; *id.*, Ex. E at 36-38; *id.*, Ex. K at 14-16.) However, defendant has taken

the position that "records relating to the proposed settlement are not responsive to the [FOIA]

request" (Def.'s Resp. to Pl.'s SMF ¶¶ 44-63), with Cooper declaring that plaintiff did not "seek

any records relating to the proposed settlement issue." (3rd Cooper Decl. ¶ 8.) The Court agrees

with defendant that settlement-related documents were not responsive to the FOIA request. Item

1 seeks documents "related specifically" to Williamson's denial of plaintiff's request for a

retroactive change in its method of accounting for repair expenses, and Item 3 seeks documents

related to "a final decision" not to allow plaintiff's "*requested protective change* in the method

of accounting . . . filed in 2001." (FOIA Request at 2 (emphasis added).) Both items relate only

to Williamson's denial of plaintiff's request for a *retroactive* wholesale change in accounting

methodology, which the Tax Court effectively affirmed in 2005, *see FPL Group II*, 2005 WL

2159680, at *2, *4 (holding that the 2001 Williamson denial was not abuse of discretion), and

therefore do not relate to post-denial settlement discussions, which focused on methodologies for

*prospectively* classifying specific items of equipment.[12]  *FPL Group III*, 2008 WL 2199696, at

---

[12] Accordingly, the Court also rejects plaintiff's suggestion that Cooper misread the scope
of Item 3 as identical to the scope of Item 1, thereby supposedly leading him to conclude that
scores of documents were non-responsive. (*See* Pl.'s Opp'n at 18-19; Pl.'s Sur-reply at 11-13.)
Cooper correctly characterized Items 1 and 3 as limited to "documents relating to the Service
decision to deny plaintiff's protective request for a change in method of accounting for the
repairs issue." (3rd Cooper Decl. ¶ 7; *see* Pl.'s Sur-reply at 11-12.) Cooper explained that "the
only documents relating to this denial of the protective request" had already been given to
plaintiff even before the Chicago office conducted its post-litigation search. (3rd Cooper Decl. ¶
7 (citing *FPL Group II*).) Further, plaintiff cannot rely upon the 2001 Williamson denial to
argue that "[e]fforts to resolve the method of accounting were ongoing" even after that denial.
(*See* Pl.'s Sur-reply at 11 (citing Pl.'s SMF ¶ 40 (citing 2nd Dawson Decl. ¶ 24 (citing but
misquoting 2001 Williamson denial)))).) Williamson's letter denied plaintiff's request for a

*2.  The Court also concludes that Items 2 and 4-8 do not encompass settlement-related documents.  Therefore, the six emails accompanying the second Dawson declaration do not establish the inadequacy of defendant's search.

Plaintiff also argues that even though responsive documents had been destroyed by Genet, the technical advisor identified by the FOIA request as a likely custodian, defendant was nonetheless obligated to follow up with other personnel who were likely to have copies of the destroyed materials.  (Pl.'s Sur-reply at 8.)  In light of the evidence presented, the Court agrees.  In an attempt to rebut plaintiff's inference that Genet had inappropriately destroyed the documents, defendant cited information derived from the purported contents of Ball's notes from her pre-litigation telephone conversation with Genet.  (*See* Def.'s Reply at 5 ("With respect to FPL's claims about destroyed records, a former Service employee destroyed records prior to the Service receiving the requests pursuant to a record retention schedule.").)  But instead of introducing a copy of the notes, and because Ball was supposedly unavailable to provide a second declaration, defendant relied instead upon a declaration by Ball's supervisor, Paula Curren (*id.*, Decl. of Paula M. Curren ¶ 3), in which she reproduced the notes:

Frank Genet 06/06/08 Utilities Technical Advisor (OH)

06/06/08 verbal & 6/13/08 email.  Verbal: records destroyed.  Repair vs Capital issue was not a coordinated effort.  They did provide some oral advice, but no directives.  This is a fact of law, no special issue directives, etc. were needed.  E:mail: I have no records electronic or in hardcopy for the requested information.  *I had a binder for this taxpayer that contained historical information such as*

---

blanket *retroactive* change in accounting methodology, and then merely suggested that plaintiff and the audit team might be able to resolve the underlying tax dispute by collaborating to determine which line items among the power plant expenses would be treated as repair expenses.  (*See* 2001 Williamson Denial at 1-2 ("[T]his should not end the matter.  We previously discussed the possibility of [plaintiff] and [the agency] working together to reach agreement as to which plant items should be expensed and which should be capitalized. . . .  I suggest that such a resolution is worth pursuing here.  I thus suggest that [plaintiff] broach the subject with the [audit] team.").)

> *correspondence with the audit team* and RARs and destroyed it earlier this year
> due to records retention rules.

(*Id.* ¶ 3-4 (emphasis added).)[13]

Even assuming that these notes are not hearsay and that they can be relied upon despite plaintiff's inability to discover them (*but see* Pl.'s Sur-reply at 8-9), the notes clarify that Genet's documents included "correspondence with the audit team," which was comprised of revenue agents Baryza, Clarke, and Northard, legal counsel Garcia-Pages, and possibly other people. "When all other sources fail to provide leads to the missing record, agency personnel should be contacted if there is a close nexus . . . between the person[nel] and the particular record." *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 328 (D.C. Cir. 1999). Here, "[t]he undisputed connection between the missing [correspondence] and [the members of the audit team] should have led the [agency] to inquire of [the audit team] as a source 'likely to turn up the information requested' regarding the missing [correspondence's] whereabouts." *Id.* (quoting *Oglesby*, 920 F.2d at 68). Although Cooper contacted Garcia-Pages and Clark as part of the post-litigation search, there is no evidence that defendant specifically sought to obtain Genet's correspondence with them (*see* 2nd Cooper Decl. ¶ 12), or that Garcia-Pages provided anything to Cooper beside a May 2002 email "congratulating Mr. Williamson on his retirement." (Pl.'s Sur-reply at 10-11; *see* 2nd Cooper Decl. ¶ 12.) There is also no evidence that defendant searched for Baryza or Northard's emails, and although Cooper suggested that Baryza "no longer work[s] for the Service" (2nd Cooper Decl. ¶ 12), defendant has not yet shown that it would have been "fruitless"" to search her email records, which may well have remained in defendant's

---

[13] Although plaintiff had sought these notes during discovery, this Court granted defendant's motion for a protective order. (*See* Pl.'s Prot. Order Opp'n, Ex. A (Pl.'s Interrog.) at 2-3 ¶ 2(e) (seeking descriptions or copies of documents memorializing Ball's contacts with IRS employees in connection with securing responsive documents).)

custody and control even after Baryza's departure.[14] *Cf. Valencia-Lucena*, 180 F.3d at 328

("Absent any indication that an inquiry of [a document's possible custodian] would be fruitless,

either because he is no longer in the [defendant's service] or because the storage of the

[document] was controlled by other persons or by internal procedures, such an inquiry was

required.").  The record is also unclear as to whether there were any other members of the audit

team.  The Court thus cannot conclude that defendant conducted an adequate search for Genet's

correspondence with the audit team.

For these reasons, defendant's motion is denied with respect to the adequacy of its search,

because the agency has not met its burden to "demonstrate beyond material doubt that its search

was reasonably calculated to uncover all relevant documents." *The Nation Magazine v. U.S.

Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995) (internal quotation marks omitted).  To address

this deficiency, defendant shall search the records of all members of "the audit team" (including

the records for members who are no longer with the IRS, provided that such records are within

defendant's possession, custody, or control) for correspondence with Frank Genet,[15] and by

April 20, 2010, it shall file an affidavit that (1) identifies all members of "the audit team," (2)

states whether the records of each member of the audit team was specifically searched for

correspondence with Frank Genet before or after defendant moved for summary judgment, and

(3) states whether any documents have been located and whether they were located before or

after defendant moved for summary judgment.  If defendant locates any documents not

previously produced that are responsive, then defendant shall disclose them to plaintiff, unless

defendant seeks to withhold or redact such documents, in which case (1) its affidavit must be

---

[14] Northard also appears to have left the IRS.

[15] However, defendant need not search the records of any audit team member whose records were previously reviewed by someone who had been specifically instructed to search for correspondence with Genet.

accompanied by a *Vaughn* index supporting the withholdings or redactions, and (2) defendant must produce the documents for *in camera* review.

## III.    EXEMPTION 5

FOIA requires disclosure of requested "agency records," including "[a]ny reasonably segregable portion of a record," absent a demonstration by the government that the materials fall within one of nine exemptions.  *See* 5 U.S.C. §§ 552(a)(3) & (b); *see also Judicial Watch, Inc. v. Dep't of Energy*, 412 F.3d 125, 128 (D.C. Cir. 2005).  Exemption 5, the only remaining exemption at issue, "protects from disclosure 'inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency.'  To qualify, a document must thus satisfy two conditions: its source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it."  *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001) (quoting 5 U.S.C. § 552(b)(5)).

The privileges that are incorporated into Exemption 5 include the deliberative process privilege, the attorney work-product privilege, and the attorney-client communications privilege. *See Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975).  Defendant asserts all three privileges as follows:[16]

---

[16] Many pages were also withheld or redacted under Exemptions 3 or 6, whose invocation plaintiff no longer disputes.

| Request | Withheld | Redacted |
|---------|----------|----------|
| First IRC Request *(AM 2006-006)* | *297 total:*<br>▪ 297: deliberative process privilege<br>▪ unspecified number of emails: attorney-client privilege | *39 total:*<br>▪ 30: deliberative process privilege<br>▪ unspecified number of emails: attorney-client privilege |
| Second IRC Request | *265 total:*<br>▪ 265: attorney work product<br>▪ 265: attorney-client privilege | *None* |
| FOIA Items 5 & 6 | *908 total:*<br>▪ 806: deliberative process privilege<br>▪ 294: attorney work product | *263 total:*<br>▪ 148: deliberative process privilege |

(*See* 1st Cooper Decl. ¶¶ 17, 28; 2nd Cooper Decl. ¶¶ 34, 37; 3rd Cooper Decl. ¶ 17.)

### A.     Privileges

#### 1.     Deliberative process

Exemption 5 has long been interpreted to include a deliberative process privilege serving a number of related ends, among them:

> assur[ing] that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism; . . . protect[ing] against premature disclosure of proposed policies before they have been finally formulated or adopted; and . . . protect[ing] against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action.

*Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980).  The privilege applies to records that the government demonstrates to be both "'predecisional'" – *i.e.*, "generated *before* the adoption of an agency policy" – and "'deliberative,'" – *i.e.*, "reflect[ive] [of] the give-and-take of the consultative process."  *Id.* at 866 (emphasis added).  The burden is on the agency to "establish[] what deliberative process is involved[] and the role played by the documents in issue in the course of that process."  *Id.* at 868.

The deliberative process privilege "covers recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Coastal States*, 617 F.2d at 866. However, the privilege does not shield documents reflecting an agency's "working law," such as the reasons which supplied the basis for a previously adopted agency policy, *Sears, Roebuck & Co.*, 421 U.S. at 152, documents that are "simply straightforward explanations of agency regulations in specific factual situations," or documents that do not "reflect 'agency give-and-take of the deliberative process by which the decision itself is made.'" *Coastal States*, 617 F.2d at 868 (quoting *Vaughn v. Rosen*, 523 F.2d 1136, 1144 (D.C. Cir. 1975)) (emphasis added). This is because an agency may not develop "a body of 'secret law,' used by it in the discharge of its regulatory duties and in its dealings with the public, but hidden behind a veil of privilege because it is not designated as 'formal,' 'binding,' or 'final.'" *Id.* at 867.

Moreover, "[f]actual material is not protected under the deliberative process privilege unless it is 'inextricably intertwined' with the deliberative material." *Judicial Watch, Inc. v. Dep't of Justice*, 432 F.3d 366, 372 (D.C. Cir. 2005) (quoting *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) (*per curiam*)). "[E]ven if some materials from the requested record are exempt from disclosure, any 'reasonably segregable' information from those documents must be disclosed after redaction of the exempt information unless the [non-]exempt portions are 'inextricably intertwined with exempt portions.'" *Johnson v. Executive Office for U.S. Attorneys*, 310 F.3d 771, 776 (D.C. Cir. 2002) (quoting 5 U.S.C. § 552(b) and *Mead Data Cent., Inc. v. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977)).

Finally, although deliberative documents are typically prepared within an agency, "in some circumstances a document prepared outside the Government may nevertheless qualify as

an 'intra-agency' memorandum under Exemption 5." *Klamath*, 532 U.S. at 9. Thus, "intra-agency" records can include documents submitted in response to "formal agency solicitation of advice from a discrete group of experts," *Nat'l Institute of Military Justice v. U.S. Dep't of Def.* ("*NIMJ*"), 512 F.3d 677, 680, 687 (D.C. Cir. 2008), such as recommendations by lawyers whose confidential counsel was solicited "based on their undisputed experience and qualifications." *Id.* at 683. However, documents from "random citizens volunteering their opinions" would not be protected, *id.*, nor would "communications to or from an interested [non-governmental] party seeking a Government benefit at the expense of other applicants." *Klamath*, 532 U.S. at 12 n.4.

## 2. Attorney Work Product

"The work product doctrine shields materials 'prepared in anticipation of litigation or for trial by or for [a] party or by or for that . . . party's representative (including the . . . party's attorney, consultant, . . . or agent)." *Tax Analysts v. Internal Revenue Serv.* ("*Tax Analysts I*"), 117 F.3d 607, 620 (D.C. Cir. 1997) (quoting Fed. R. Civ. P. 26(b)(3)). "The purpose of the privilege, however, is not to protect any interest of the attorney, who is no more entitled to privacy or protection than any other person, but to protect the adversary trial process itself." *Coastal States*, 617 F.2d at 864. A document "prepared for use in litigation, whether the litigation was underway or merely anticipated," *United States v. Textron Inc. & Subsidiaries*, 577 F.3d 21, 29 (1st Cir. 2009) (*en banc*), and "not just the portions concerning opinions, legal theories, and the like, is protected by the work product doctrine and falls under [E]xemption 5." *Tax Analysts I*, 117 F.3d at 620. For this reason, "segregability is not required" for a document that is "fully protected as work product . . . ." *Judicial Watch*, 432 F.3d at 371.

## 3. Attorney-client communications

"The attorney-client privilege protects confidential communications from clients to their

24

attorneys made for the purpose of securing legal advice or services." *Tax Analysts I*, 117 F.3d at 618. The privilege also "protects communications from attorneys to their clients if the communications 'rest on confidential information obtained from the client.'" *Id.* (quoting *In re Sealed Case*, 737 F.2d 94, 98-99 (D.C. Cir. 1984)). Where a government entity's documents do not "rest upon confidential information obtained from" a government client, it is "not covered by the attorney-client privilege" and may not be withheld on that basis. *Citizens for Responsibility & Ethics in Wash. v. Office of Admin.*, 249 F.R.D. 1, 4 (D.D.C. 2008).

**B.      First IRC Request (Count I)**

For the first IRC request, 298 withheld pages and 39 redacted pages remain at issue. These pages consist of "drafts, handwritten notes, and e-mails relating to the revenue ruling" contained in AM 2006-006. (Def.'s Reply at 7.) According to defendant, these documents are "draft memoranda and email discussions among Chief Counsel employees on the exact same issue addressed in the written determination" found in AM 2006-006, *i.e.*, "what is the appropriate tax treatment of costs of restoring property when the taxpayer has claimed a casualty loss." (1st Cooper Decl. ¶ 17.)

Defendant argues that the deliberative process privilege properly applies to the draft memoranda because they are pre-decisional, having been "prepared prior to the final approval of the memoranda by the Associate Chief Counsel," and deliberative, as "they 'reflect the suggested revisions and recommendations of Chief Counsel attorneys involved in'" the memorandum's drafting. (Def.'s Mem. of P. & A. in Supp. of SJ Mot. ("Def.'s SJ Mem.") at 33 (quoting 1st Cooper Decl. ¶ 17).) Although defendant did not provide a *Vaughn* index for these documents, Cooper's second declaration offers some descriptions of the responsive documents being withheld in full. (*See* 2nd Cooper Decl. ¶ 41.) Plaintiff responds that defendant's assertion of

the privilege is insufficiently specific and overbroad, and that some of the documents at issue are not deliberative but rather relate to the application of established law to the specific facts of plaintiff's method of accounting for repair expenses. (Pl.'s Opp'n at 27-29; Pl.'s Sur-Reply at 19.)[17]

Cooper's declarations provide sufficient detail about 296 of the 298 withheld pages "to inform plaintiff of the nature of the information withheld and the reasons therefore and to permit the Court to determine the applicability of each exemption claimed." *Fischer*, 596 F. Supp. 2d at 44. These pages are described as deliberations related to AM 2006-006's development, whose release could discourage candid intra-agency discussion and also confuse the public by disclosing tentative rationales not ultimately published in support of AM 2006-006.[18] (*See* 2nd

---

[17] The Court rejects plaintiff's argument that defendant's invocations of the deliberative process privilege "should be overruled because they were not properly made by the appropriate delegate of the [IRS] Commissioner" as set forth in an agency delegation order, and because they "did not meet the standards for assertion" set forth in that delegation order and in a FOIA guidance memorandum issued by Attorney General Holder. (Pl.'s Sur-reply at 13-15; *see also* Pl.'s Opp'n at 31-33; 1st Carney Decl., Ex. A at 4-6 ("Holder Memorandum").) First, "[t]here is simply no basis in law or practice for believing that the personal invocation of a privilege is a prerequisite to withholding under FOIA." *Lardner v. U.S. Dep't of Justice*, No. 03-CV-180, 2005 WL 758267, at *8 (D.D.C. Mar. 31, 2005). Second, the IRS order cited by plaintiff addresses delegation authority for situations where "[c]ertain federal courts recognize claims of executive privilege *by the head of the agency as the sole basis* for protecting internal or inter-agency records . . . ." *See* IRS Delegation Order 30-4 (Oct. 1, 2009) (emphasis added), *available at* http://www.irs.gov/pub/foia/ig/disclosure/do-30-4.pdf (last visited March 10, 2010). This is not such a situation. *See Lardner*, 2005 WL 758267, at *8 ("There is no indication in the text of the statute or elsewhere that Congress anticipated – much less demanded – that the decision to withhold documents under Exemption 5 would need to be made personally by the head of the agency . . . . [N]o court has ever indicated that [a high-level agency] official must make the determination that a document comes within Exemption 5 . . . ."). Third, Attorney General Holder's memorandum regarding "a presumption of openness" is non-justiciable, especially given that it states that it does not create any enforceable rights against the government. (*See* Holder Memorandum at 3.)

[18] Plaintiff also argues, citing Cooper's third declaration, that these documents have been improperly withheld as "agency working law." (*See* Pl.'s Sur-reply at 19.) This misconstrues Cooper's declaration, which explains merely that the agency has withheld "deliberative documents *underlying* 'agency working law'" – *i.e.*, deliberations underlying the AM 2006-006

Cooper Decl. ¶ 42.)  In addition, Cooper declared under penalty of perjury that the documents "withheld in their entirety" were either wholly exempt or contained nonexempt material that was "so inextricably intertwined with exempt material as to be non-segregable."  (1st Cooper Decl. ¶ 16; *see also id.* at 15 (oath and signature).)  From this, and because "there is nothing in the record to indicate that such [withholdings] are inappropriate," the Court concludes that defendant has satisfied its segregation burden.  *Judicial Watch, Inc. v. U.S. Dep't of Justice*, No. 01-CV-639, 2006 WL 2038513, at *5-*6 (D.D.C. July 19, 2006) (rejecting plaintiff's segregation claim where agency declaration "very clearly declare[d], under penalty of perjury, . . . that 'all reasonably segregable information has been disclosed'").  Defendant's motion is granted as to these 296 withheld pages.

However, two withheld pages lack adequate descriptions and are identified by control numbers CI090 ("Internal emails" from June 2006 between two agency attorneys "discussing the results of initial research on casualty losses") and CI109 ("Handwritten notes mentioning certain issues under section 162 of the Internal Revenue Code").  (2nd Cooper Decl. ¶ 41.)  These descriptions are not specific enough to establish that the documents "make[] recommendations or express[] opinions on" the drafting of AM 2006-006, *Vaughn*, 523 F.2d at 1144, or even "what deliberative process is involved" or "the role played by the documents . . . in the course of that process."[19]  *Coastal States*, 617 F.2d at 868.  Defendant's motion for summary judgment is

<hr />

written determination.  (3rd Cooper Decl. ¶ 22 (emphasis added).)  To withhold such underlying, preliminary deliberations does not run counter to *Coastal States*'s admonition against "secret law."

[19] Defendant asserts that page CI090 consists of "facts selectively assembled by the Service" whose disclosure would reveal the contours of defendant's deliberations.  (Def.'s Reply at 11.)  This argument relies upon the D.C. Circuit's opinion in *Montrose Chemicals Corp. of California v. Train*, 491 F.2d 63 (D.C. Cir. 1974).  (*See* Def.'s Reply at 10.)  However, *Montrose* involved a situation where "all the facts" contained in the withheld documents were "in the public record," and what was protected was the agency's "evaluation and selection of certain

denied as to these two pages.

Defendant also concedes that Cooper's declarations offer no information about the 39 pages that were disclosed with redactions. (*See* Def.'s SJ Mem. at 33; 2nd Cooper Decl. ¶ 41.) This leaves the Court without any basis to conclude that the redacted material is protected by either the deliberative process or attorney-client privilege. And because defendant has not sustained its burden to establish Exemption 5's applicability, defendant has necessarily failed to show that all reasonably segregable non-exempt portions of these records have been disclosed. Defendant's motion is denied as to the 39 redacted pages.

By April 20, 2010, defendant shall produce pages CI090 and CI109 and unredacted versions of the 39 redacted pages for *in camera* review. Defendant shall specify the privilege invoked for each withholding or redaction, and if defendant continues to invoke the attorney-client privilege for any of these documents, the documents must be accompanied by an affidavit submitted *in camera* explaining how each withholding or redaction reflects "confidential communications from clients to their attorneys made for the purpose of securing legal advice or services" or "communications from attorneys to their clients" that "'rest on confidential information obtained from the client.'" *Tax Analysts I*, 117 F.3d at 618 (quoting *In re Sealed Case*, 737 F.2d at 99). By April 20, 2010, defendant shall also file (1) a *Vaughn* index that summarizes each document produced *in camera*, identifies each document's author(s), states whether it is responsive to FOIA request Item 5, Item 6, or both, and states whether it is

---

facts from the 9200-page public record." 491 F.2d at 70. *Montrose* "is to be distinguished from a situation in which the only place certain facts are to be found is in [the withheld documents]." *Id.* Where a court "confront[s] a case in which some facts are only found in the [agency's withheld documents]," then "the Government would bear the burden of putting the record in such shape that all facts are in the public record, separate from analysis which need not be disclosed." *Id.* at 70-71. Because the record is silent as to the type of research and facts contained in page CI090, the Court cannot determine which situation is presented by the document.

protected by the deliberative process privilege, attorney-client privilege, or both; and (2) an affidavit explaining the role of each document's author(s) within the IRS, the role (if any) played in the deliberative process by each document or by each document's redacted portions, and whether each document contains privileged attorney-client communications as defined above.

### C. Second IRC Request (Count II)

For the second IRC request, 265 withheld pages remain at issue. They "all involve discussions among Chief Counsel employees prepared during or in anticipation of active litigation with the plaintiff" with respect to the Tax Court case. (2nd Cooper Decl. ¶ 45; *see also* Def.'s SJ Mem. at 28.) The records "were primarily created by attorneys from [OCC], including attorneys setting forth the service's legal position in the [Tax Court] litigation in documents called workplans." (Def.'s Reply at 17 (citing 2nd Cooper Decl. ¶ 45).) Defendant asserts both the attorney work product privilege and attorney-client privilege for each document.

Defendant asserts that the withheld pages constitute attorney work product because they "involve discussions among counsel employees prepared *during* or in anticipation of active litigation with the plaintiff" in the Tax Court case. (1st Cooper Decl. ¶ 28 (emphasis added); *see* Def.'s SJ Mem. at 28.) For example, the records include drafts and comments upon workplans that set forth defendant's case strategy in the Tax Court litigation. (1st Cooper Decl. ¶ 28.)

Defendant accurately states the legal standard with respect to documents prepared "in anticipation" of litigation. But it appears that defendant may be overstating the privilege's scope by suggesting that it also applies to materials described simply as having been prepared "during" active litigation. As plaintiff observes, "documents containing discussions of [p]laintiff's accounting methods do not become 'work product' by the mere happenstance that the discussions occurred during a pending case involving a different taxpayer with the same or

similar issues." (Pl.'s Sur-reply at 21.) In other words, an attorney's mental impressions do not become protected work product simply because they were expressed *concurrently with* some form of litigation. Rather, the expressions must be prepared either "in anticipation of" litigation or, if the litigation is ongoing, "for" litigation, whether for trial, appeal, or litigation resolution. *See Textron*, 577 F.3d at 29; *Fed. Trade Comm'n v. Grolier Inc.*, 462 U.S. 19, 25 (1983) (observing in FOIA case that "the literal language of [Federal Rule of Civil Procedure 26(b)(3)] protects materials *prepared for* any litigation or trial" (emphasis added; original emphasis removed)); *see, e.g.*, *N.Y. Times Co. v. U.S. Dep't of Defense*, 499 F. Supp. 2d 501, 517 (S.D.N.Y. 2007) (exempting from disclosure records that provided guidance for responding to motions).

Cooper's declarations provide sufficient detail about 235 of the 265 withheld pages to support the privilege's application, because these pages are described as litigation strategy workplans or comments upon those workplans. (*See* 2nd Cooper Decl. ¶ 45.) Because these 235 documents are "fully protected as work product, . . . segregability is not required." *Judicial Watch*, 432 F.3d at 371. Accordingly, defendant's motion is granted as to these 235 pages.

By contrast, the Court concludes that the following 30 pages have not been described with sufficient clarity to sustain the invocation of either the attorney work product or attorney-client privilege:

- CII001 and CII014 ("A string of emails dated December 10, 2008 pertaining to the submission of [an] attached workplan . . . for review by attorneys in [Feldstein's OCC section]");

- CII078-CII099 (to the extent that they constitute "[t]he same strings of emails in CII001"); and

- CII267-268, CII281-282, and CII297-298 ("e-mail string[s]" between agency attorneys, to the extent that they "pertain[] to the submission of one of the workplans").

(2nd Cooper Decl. ¶ 45.)  Cooper describes these 30 pages as involving attorney discussions "prepared during *or* in anticipation of active litigation" (*id.*), so it cannot be determined from his declaration whether these 30 pages of emails were written "during" – *i.e.*, concurrently with – but *not* "in anticipation of" the active litigation.  If they were prepared "during" litigation, then the fact that they "pertain[ed] to" the submission of litigation workplans would be too vague to establish that the emails were prepared "for" litigation, whether ongoing or anticipated, as would be required to merit the privilege.  *See Textron*, 577 F.3d at 29; *Grolier*, 462 U.S. at 25.  The Court also cannot determine from Cooper's descriptions of these emails (*see also* 1st Decl. ¶ 29) whether they are protected by the attorney-client privilege.  Accordingly, defendant's motion for summary judgment is denied as to these 30 pages.

By April 20, 2010, defendant shall produce pages CII001, CII014, CII078-CII099, CII267-268, CII281-282, and CII297-298 for *in camera* review.  Defendant shall specify the privilege invoked for each withholding, and if defendant continues to invoke the attorney-client privilege for any of these documents, the documents must be accompanied by an affidavit submitted *in camera* explaining how each withholding reflects "confidential communications from clients to their attorneys made for the purpose of securing legal advice or services" or "communications from attorneys to their clients" that "'rest on confidential information obtained from the client.'"  *Tax Analysts I*, 117 F.3d at 618 (quoting *In re Sealed Case*, 737 F.2d at 99).  By April 20, 2010, defendant shall also file (1) a *Vaughn* index that summarizes each document produced *in camera*, identifies each document's author(s), states whether it is responsive to FOIA request Item 5, Item 6, or both, and states whether it is protected by the attorney work product privilege, attorney-client privilege, or both; and (2) an affidavit explaining the role of each document's author(s) within the IRS and whether each document was prepared "in

anticipation of" litigation, whether it was prepared "for" litigation, or whether it contains privileged attorney-client communications.

### C.     FOIA Request Items 5 & 6 (Count III)

The withheld and redacted pages at issue that are responsive to Item 5 and 6 of the FOIA request relate to the IIR process.  (*See* Def.'s Reply at 7.)  In support of its reply brief, defendant submitted a third declaration by Cooper that was accompanied by a privilege log for these documents.  (*See* 3rd Cooper Decl. ¶ 20 & Ex. F ("Privilege Log").)  The privilege log lists each document's Bates number, date, description, and claimed exemption, but plaintiff contests the log's adequacy.  (*See* Pl.'s Sur-reply at 3 n.1.)

Based on the Court's review of the log's listing of 178 discrete documents, 137 documents were withheld or redacted under Exemption 5.  The withheld and redacted documents at issue are (1) "drafts of the proposed revenue ruling and related documents prepared by the drafting team," (2) "email discussions" among agency counsel and other employees about "the potential content of two sets of proposed regulations," (3) "briefing memoranda . . . prepared by the drafting team analyzing various legal issues in the draft revenue ruling," (4) "conference reports" prepared by the drafting team which summarize meetings of agency counsel and other employees "discussing legal issues in the draft revenue ruling," (5) "[b]ackground information notes, handwritten notes, and other documents prepared by the drafting team during the review of the proposed revenue ruling" (2nd Cooper Decl. ¶ 35; *accord* Def.'s Reply at 7, 9), and (6) email discussions among agency counsel and other employees regarding the agency's then-active litigation in *Federal Express Corp. v. United States*, 412 F.3d 617, 617 (6th Cir. 2005) (affirming district court's conclusion that taxpayer could deduct equipment maintenance costs as repair expenses instead of capitalizing them) ("the *FedEx* litigation"), and "its effect on the issue under

consideration" – *i.e.*, the repair expense issue.  (2nd Cooper Decl. ¶ 37; 3rd Cooper Decl. ¶¶ 17-18; *accord* Def.'s Reply at 15.)

Defendant has invoked the deliberative process privilege for 134 documents.  Defendant contends that their disclosure could, *inter alia*, confuse the public by disclosing tentative rationales not ultimately published and discourage candid intra-agency discussion about the drafting of revenue rulings, thus undermining defendant's ability to perform its "'tax administration function of publishing guidance.'"  (Def.'s Reply at 13-14 (quoting 3rd Cooper Decl. ¶ 14); *see also* 2nd Cooper Decl. ¶ 36.)

As a threshold matter, plaintiff argues that because EEI and its counsel participated "extensive[ly]" with defendant in the course of the IIR process, including by sharing information and comments regarding the proposed revenue ruling, "it can hardly be argued that the IIR process consisted of an internal deliberative process solely undertaken by" the agency.  (Pl.'s Sur-reply at 17-18.)[20]  Defendant correctly observes that the mere participation of outside entities

---

[20] Plaintiff further contends that even if the IIR program was a deliberative process, the proposed revenue ruling was ultimately adopted by the agency as working law that must be disclosed.  (*See* Pl.'s Sur-reply at 18.)  Because defendant supposedly "conceded that the proposed ruling was incorporated ('rolled') into [d]efendant's published proposed 'tangible property' regulations," plaintiff concludes that "the proposed revenue ruling became [d]efendant's *final policy* as to the issues raised during the IIR process," rendering "any underlying facts, analysis, documents, and memoranda supporting [d]efendant's final policy, *i.e.*, the proposed revenue ruling, . . . subject to disclosure."  (*Id.* (emphasis added).)

This argument fails because plaintiff overstates defendant's concession.  All that is undisputed is that "*the IIR project* was rolled into the *proposed* tangible [asset] regulations." (Pl.'s SMF ¶ 90; Def.'s Resp. to Pl.'s SMF ¶ 90 (emphases added).)  There is no evidence that the proposed revenue ruling itself was incorporated into anything.  (*Cf.* 2nd Dawson Decl., Ex. NN (Feldstein email referencing EEI counsel's "concern[] about the prospect of rolling this *IIR project* into the tangible regs" (emphasis added)); *id.*, Ex. OO (Feldstein email explaining that EEI's concern stemmed from that the possibility that "we may *hold up* the ruling for the tangible regulation" (emphasis added)).)  Further, even if it were proper to assume that "the IIR project" is synonymous with "the proposed revenue ruling" and that the latter was incorporated into the *proposed* 2006 tangible asset regulations, there is no evidence that it was incorporated into any *final* regulations or was otherwise "adopted, formally or informally, as the agency position on an

in agency decision-making does not necessarily abrogate the privilege. (*See* Def.'s Reply at 12.) *See, e.g.*, *NIMJ*, 512 F.3d at 681. Defendant also represents that while the IIR team did solicit feedback from utility industry representatives, "[t]he Service is not withholding the utility representatives' feedback," and that "the information [being] withheld consist[s] of purely internal comments." (Def.'s Reply at 12 (citing 3rd Cooper Decl. ¶ 16).)[21] This representation appears to be contradicted by the privilege log's statement that defendant has "[w]ithheld in full" a letter from Miller & Chevalier, EEI's outside legal counsel, to Ron Loncharich, an IRS Territory Manager.[22] (*See* Privilege Log at 5.) Given this entry in the log, it cannot be said that every withheld document listed in the log is necessarily an "intra-agency memorandum" within the meaning of Exemption 5. *See* 5 U.S.C. § 552(b)(5). The Court concludes that the descriptions offered in the privilege log and by Cooper are insufficient to establish that the Miller & Chevalier letter and the following three withheld documents are "intra-agency memoranda":

- "Response to IIR Questionnaire on Electric Generation Assets – Capital vs. Expense" (Bates number 2422);

- "Document titled 'Treatment of Utility Assets IIR – Research Summary'" (Bates numbers 3476-3479); and

- "Write-up for Utility Assets IIR Team regarding certain factors to consider in addressing an issue in the proposed published guidance" (Bates number 3480).

As a result, the Court cannot rule out that these documents might consist of non-exempt

---

issue" or "used by the agency in its dealings with the public" so as to become non-exempt working law. *Coastal States*, 617 F.2d at 866. (*See also* Pl.'s SMF ¶ 91 (stating that proposed 2006 tangible asset regulations were withdrawn in 2008 "with the issuance of new proposed regulations").)

[21] Cooper similarly asserted that the documents responsive to Items 5 and 6 were either documents "prepared by the drafting team" or emails exchanged among agency attorneys and other personnel. (2nd Cooper Decl. ¶¶ 35, 37; 3rd Cooper Decl. ¶¶ 17-18.)

[22] The document is identified by Bates numbers 2621-2622.

submissions by non-agency entities such as EEI.[23]  For this reason, defendant's motion for summary judgment is denied as to these four documents. [24]

With respect to the other 130 documents withheld or redacted under the deliberative process privilege, plaintiff also argues that defendant "has not provided a sufficiently individualized description of the 'deliberative' nature of any of the documents, or how those documents relate to a 'deliberative process' . . . ."  (Pl.'s Sur-reply at 16; *see also* Pl.'s Opp'n at 27.)  Although this argument is unpersuasive with respect to 51 documents, the Court agrees with plaintiff that the other 79 documents are inadequately described.

First, defendant has met its burden with respect to the 17 documents described as

---

[23] The Court is skeptical that a submission *from* EEI (or other outside entities) *to* the agency as part of the IIR program, such as EEI's factual and legal analyses (*see* 2nd Dawson Decl., Ex. W), should be considered an "intra-agency" document.  Unlike situations where Exemption 5 applies to documents "submitted by non-agency parties in response to an agency's request for advice," *NIMJ*, 512 F.3d at 681, this is not a case where the agency "sought these [taxpayers] out and solicited their counsel based on their undisputed experience and qualifications."  *Id.* at 683.  EEI was merely a representative of "random citizens volunteering their opinions" when it initially requested published guidance on the repairs expense issue.  *Id.* And unlike *NIMJ*, where the agency asked individual lawyers to provide *confidential* legal views, *see id.*, the IIR program's relevant revenue procedure expressly advises that outside submissions "may be subject to disclosure" under FOIA and that "*[a]ll submissions* under the IIR program will be made available for public inspection and copying in their entirety."  Rev. Proc. 2003-36 § 6.03 (emphasis added).  Finally, the record does not show that EEI was an indifferent agency consultant; rather, it was an industry representative advancing industry interests when it made the unsolicited offer to "provide whatever information is deemed necessary for a successful resolution *of this key industry issue*."  (2nd Dawson Decl., Ex. V at 3.) *Cf. Klamath*, 532 U.S. at 12 (rejecting Exemption 5's application to Indian tribes' communications with agency undertaken "with [the tribes'] own, albeit entirely legitimate, interests in mind," where the tribes were "self-advocates at the expense of others seeking benefits inadequate to satisfy everyone").

[24] The log describes the Miller & Chevalier letter as the "[s]ame as Pages 01888-01889" except for "many handwritten notes" written upon the letter by an OCC attorney.  Cooper's second declaration suggests that Bates numbers 1884-1896 have been produced to plaintiff in full, despite the log's statement that the letter is being withheld in its entirety.  Nonetheless, even if only the handwritten notes are being withheld, defendant has still failed to sufficiently describe those notes' role in the deliberative process and whether the notes contain unprivileged working law that must be disclosed.  The same is true of the other three documents.

summaries of IIR team meetings, notes from Chief Counsel briefings on the proposed revenue ruling, or briefing memoranda, outlines, charts, and notes related to legal analyses and recommendations for the proposed ruling.[25]  Based on the descriptions provided in the privilege log and by Cooper (*see* 2nd Cooper Decl. ¶ 35), the Court concludes that these are "notes taken by employees in internal meetings" or documents "exchanging thoughts and opinions about various legal and policy decisions," all of which are "part of the group thinking and preliminary actions encompassed by the policy making process in an agency.  Disclosure of such documents would risk causing an injury to the quality of this process, which is what Exemption 5 seeks to avoid."  *Hornbostel v. U.S. Dep't of Interior*, 305 F. Supp. 2d 21, 31 (D.D.C. 2003); *see also Am. Civil Liberties Union v. F.B.I.*, 429 F. Supp. 2d 179, 190-91 (D.D.C. 2006) (granting summary judgment as to "working proposals and briefing papers regarding policy that reflect predecisional discussion by [IRS] employees").

Defendant has also sufficiently described seven documents as deliberations from subordinate personnel to superior agency decision-makers[26] and four documents as status reports and questions regarding the proposed revenue ruling.[27]  *See Morley v. CIA*, 508 F.3d 1108, 1127

---

[25] Bates numbers 2723-2731, 2792-2814, 2949-2975, 2989-2990, 3073-3074, 3077-3074, 3153-3154, 3178-3200, 3207-3210, 3253-3275, 3380-3405, 3481-3484, 3485-3508, 3524-3549, 3550-3554, 3555-3557, and 3558-3562.

[26] Three documents are described as a technical advisor's "comments on IIR team proposals" to Area Counsel (Bates numbers 2508-2509, 2658-2659, and 2943-2944), one is described as a memorandum from a revenue agent to a Territory Manager expressing the agent's views on the repair expenses issues (2544-2548), and three are described as emails to the IRS Chief Counsel from subordinate attorneys regarding issues "surrounding whether to publish" the proposed ruling (3120-3140, 3141-3146, and 3147-3152).

[27] The log sufficiently describes one internal email among Feldstein and others "regarding the status of, and suggested revisions to, the proposed revenue ruling" (Bates numbers 2656-2657), and three other documents that that were inadequately described by the privilege log are given fuller descriptions by Cooper: "comments and questions" emailed by Sharon Russell, Capitalization Technical Advisor, to Feldstein regarding a draft of the proposed ruling (2331); an email from Feldstein to agency special counsel "providing an update on the

(D.C. Cir. 2007) ("'The identity of the parties to the memorandum is important; a document from a subordinate to a superior official is more likely to be predecisional, while a document moving in the opposite direction is more likely to contain instructions to staff explaining the reasons for a decision already made.'" (quoting *Coastal States*, 617 F.2d at 868)); *Hornbostel*, 305 F. Supp. 2d at 31 (finding Exemption 5 was properly invoked for "status reports, briefings, opinion papers, and proposals" that "contained the opinions, speculations, suggestions, updates, corrections, and proposed plans involved in the decision-making process behind defendant's project," where "disclosure of such information would stifle the candor necessary in an agency's policy making process"). Accordingly, defendant has established that these 11 documents reflect the privileged "give-and-take of the consultative process." *Coastal States*, 617 F.2d at 866.

Plaintiff's argument also fails with respect to 21 documents that defendant specifically described as "drafts"[28] of revenue rulings and other materials. "Draft documents, by their very nature, are typically predecisional and deliberative," *see Exxon Corp. v. Dep't of Energy*, 585 F. Supp. 690, 698 (D.D.C. 1983), and these documents' role in the deliberative process is adequately described by Cooper and in the privilege log.

By contrast, defendant has failed to satisfy its burden with respect to eight documents whose descriptions suggest that they could contain unprivileged agency working law, particularly because they may "concern[] specific taxpayers or classes of taxpayers," *Tax*

---

status of the utilities IIR project and the significant issues that need to be resolved" (2514-2515); and emails between Feldstein and another agency special counsel "regarding the status of the proposed revenue ruling" (2684-2687). (*See* 2nd Cooper Decl. ¶ 35.)

[28] The documents falling into these categories are identified by Bates numbers 1961-1977, 2710-2718, 2770-2791, 2815-2818, 2821-2857, 2871-2914, 2977-2986, 2987-2988, 3155-3158, 3159-3177, 3227-3230, 3231-3252, 3276-3279, 3280-3300, 3301-3376, 3377-3379, 3406-3409, 3410-3430, 3431-3434, 3457, and 3514-3523. Additionally, most of these documents are described either as draft revenue rulings and "background information notes," which are specifically protected by the privilege. *See Arthur Andersen & Co. v. Internal Revenue Serv.*, 679 F.2d 254 (D.C. Cir. 1982).

*Analysts v. I.R.S. ("Tax Analysts II")*, 294 F.3d 71, 81 (D.C. Cir. 2002), or may otherwise be "straightforward explanations of agency regulations in specific factual situations."[29] *Coastal States*, 617 F.2d at 868. If the documents "propose[] solutions to a potential legal problem," they would likely be privileged as deliberative, but if they merely recite or apply departmental positions, then they may have to be disclosed as agency working law, "whether or not those who use the working law make the final decisions about program implementation." *Tax Analysts II*, 294 F.3d at 81.

For the same reason, the Court concludes that defendant has too vaguely described 62 documents as "regarding" the proposed revenue ruling or agency attorneys' "comments" on or "concerns," "problems," or "issues" with that proposal.[30] Plaintiff correctly observes that these descriptions do not permit the Court to determine whether the documents "'discuss the wisdom or merits of a particular agency policy'" or "'simply explain and apply established policy.'" *Tax Analysts II*, 294 F.3d at 81 (quoting *Coastal States*, 617 F.2d at 869). (*See* Pl.'s Sur-reply at 16 & n.7.)[31]

---

[29] These documents consist of the response to a summary and analysis of the repair expense issue for "various third party taxpayers" (Bates numbers 2549-2620 and 2993-3071), a write-up and correspondence by Feldstein to an agency engineer regarding "proposed facts and analysis relating to a specific situation" for the proposed ruling (3472-3474 and 3475); and four documents comparing the legal arguments from the *FedEx* litigation with the proposed revenue ruling (2699-2708, 2745-2758, 3211-3220, and 3221-3226).

[30] Bates numbers 2483-2507, 2510-2513, 2516-2524, 2525-2530, 2531-2540, 2541-2543, 2655, 2660-2661, 2662-2663, 2664-2665, 2666, 2667, 2668-2670, 2671-2672, 2673-2674, 2678-2682, 2683, 2688-2689, 2690-2695, 2696-2697, 2698, 2732-2739, 2740-2741, 2742-2743, 2744, 2759-2760, 2761-2762, 2763-2764, 2765-2767, 2768, 2769, 2819-2820, 2858-2860, 2861-2868, 2869-2870, 2925-2926, 2927-2928, 2930-2931, 2933-2934, 2935, 2936-2937, 2938, 2939, 2940, 2941, 2942, 2946, 2947-2948, 2976, 2991-2992, 3072, 3435-3436, 3437, 3438, 3439-3442, 3443-3449, 3450, 3451-3453, 3454-3455, 3458-3460, 3463-3464, and 3467-3468.

[31] The concern that these documents may reflect official agency policy is heightened by the fact that many of them are emails to or from Feldstein, one of the two principal drafters of the proposed guidance and regulations.

Defendant also fails to describe the contents of six sets of handwritten notes that were redacted from documents provided by non-governmental entities.[32] Cooper's declaration that members of the drafting team wrote these notes "during" – *i.e.*, concurrently with – the IIR process is insufficient to establish the role of these notes in that process. (3rd Cooper Decl. ¶ 19.) In addition, one withheld document that is duplicative of a withheld draft also contains a set of "numerous handwritten comments" by Feldstein "on [the] side of [the] page."[33] Because there is no further description of any of these notes, defendant has failed to establish, as it must, "the role played by" these seven sets of notes in the deliberations. *Coastal States*, 617 F.2d at 868.

The remaining four documents relate to requests for "Technical Assistance" ("TA"). In *Tax Analysts II*, the D.C. Circuit explained that "[t]he distinction between deliberative TA[] [memoranda] and TA[] [memoranda] that represent the OCC's considered legal conclusions [and which are not privileged] is not amenable to a categorical formula. It can turn on the subject matter of the TA [memoranda], on its recipient, on its place in the decisionmaking process, and even on its tone." 294 F.3d at 82. Here, two of the documents are TA requests from Feldstein to "Chief, Branch 6, Associate Chief Counsel," "providing analysis and requesting assistance regarding the definition of a unit of property."[34] As TA *requests*, these two documents are necessarily precursors to TA memoranda and therefore are deliberative and predecisional, even if the TA memoranda written in response are not privileged. The other two documents are

---

[32] Bates numbers 1882-1883 (notes written on Feldstein's letter to EEI's counsel), 1897-1905 (notes written on EEI's IIR factual submission), 1919 (notes written on a letter from EEI's counsel to Loncharich), 1926-1930 (same), 1933 (same), and 2019 (notes written on a diagram of a power plant).

[33] Bates numbers 3461-3462 (otherwise identical to Bates numbers 2508-2509).

[34] Bates number 3465 and 3512-3513.

described as identical copies of a memorandum from "P. Friedman" to Feldstein "providing advice regarding the definition of a unit of property."[35] This could well be a TA memorandum responding to Feldstein's TA request. But because defendant offers no further description of the memorandum or the deliberative role of "P. Friedman," it is possible that these two documents may be unprivileged if they "reflect[] OCC's considered position on a precise issue." *Tax Analysts II*, 294 F.3d at 80.

With respect to the 51 documents that defendant described in sufficient detail, the Court concludes that defendant has also met its segregation burden. Cooper declared, under penalty of perjury, that the documents "withheld in their entirety" were either wholly exempt or contained nonexempt material that was "so inextricably intertwined with exempt material as to be non-segregable," and "that the documents redacted in part were properly redacted." (2nd Cooper Decl. ¶ 33; *see also id.* at 42 (oath and signature).) Defendant has already "voluntarily segregated and disclosed factual portions of hundreds of other [pages]" responsive to Item 7. *Loving v. U.S. Dep't of Defense*, 496 F. Supp. 2d 101, 110 (D.D.C. 2007), *aff'd*, 550 F.3d 32, 41 (D.C. Cir. 2008). Given that plaintiff does not dispute those Item 7 redactions, for which Cooper gave an identical segregability declaration (*see* 2nd Cooper Decl. ¶ 17), and because there is nothing in the record indicating that the redactions to these 51 documents are inappropriate, *see Judicial Watch*, 2006 WL 2038513, at *5-*6, the Court concludes that defendant has satisfied its segregability obligation with respect to these 51 documents. Defendant's motion is granted, but for the reasons discussed, defendant's motion is denied as to the 79 documents insufficiently described as deliberative.

Defendant has also withheld 294 pages, comprising 16 documents, as attorney work

_____

[35] Bates numbers 3469-3471 and 3509-3511.

product.  (2nd Cooper Decl. ¶ 37; *see* Privilege Log.[36])  Plaintiff has conceded that two of these

documents are protected work product[37] (*see* Pl.'s Sur-reply at 22), so the Court grants

defendant's motion as to these documents.  And as already discussed, six of the documents are

described sufficiently to merit protection under the deliberative process privilege.[38]  Thus, the

Court need only consider whether the remaining eight documents are protected work product.[39]

Cooper declared that these emails, memoranda, and briefing materials "involve

discussions among Counsel and Service employees regarding" the *FedEx* litigation and its effect

on the issue under consideration" in the proposed revenue ruling (2nd Cooper Decl. ¶ 37; 3rd

Cooper Decl. ¶ 17), as well as the proposed revenue ruling's impact on "any other litigation in

the future . . . ."  (3rd Cooper Decl. ¶ 18.)  However, it is not enough that these documents

"involve discussions" among agency employees "regarding" the *FedEx* litigation, the revenue

ruling, or future related litigation; rather, the documents must have been prepared "for" or "in

anticipation of" litigation.[40]  *See Textron*, 577 F.3d at 29; *Grolier*, 462 U.S. at 25.  The privilege

---

[36] The privilege log suggests that some of these pages were in fact released with redactions.  The Court's tabulations have ignored this discrepancy.

[37] Bates numbers 2623-2652 (a draft appellate brief in the *FedEx* litigation) and 3201-3206 (a letter from OCC to the appellate brief's author regarding whether to appeal the adverse *FedEx* district court decision).

[38] Bates numbers 2710-2718, 2723-2731, 3120-3140, 3141-3146, 3147-3152, and 3153-3154.  *See supra* notes 25-28 and accompanying text.

[39] As described, four documents are comparisons or similar analyses of the legal arguments made in the *FedEx* litigation and the proposed revenue ruling (Bates numbers 2699-2708, 2745-2758, 3211-3220, and 3221-3226), and four are emails among Feldstein and other agency attorneys "regarding discussions with DOJ as to ongoing issues with [the] proposed revenue ruling" (2696-2697, 2732-2739, and 2763-2764) or "regarding unresolved issues with [the] proposed revenue ruling" (2915-2924).

[40] Although Cooper declared that some documents responsive to the second IRC request were discussions among OCC employees' "prepared during or in anticipation of active litigation" (2nd Cooper Decl. ¶ 45), his work product declaration as to the FOIA request conspicuously lacks any similar assertion, stating merely that the documents were discussions among OCC and other IRS employees "regarding active litigation . . . ."  (*See id.* ¶ 37; *see also*

41

log's descriptions of these eight documents also say nothing about whether they were created for or in anticipation of litigation. Because the Court cannot rule out that they contain non-exempt applications of the *FedEx* litigation as agency working law (*see* Pl.'s Sur-reply at 22-23), defendant's motion is denied as to these eight documents.

By April 20, 2010, defendant shall produce the pages identified by Bates numbers 1882-1883, 1897-1905, 1919, 1926-1930, 1933, 2019, 2422, 2483-2507, 2510-2513, 2516-2524, 2525-2530, 2531-2540, 2541-2543, 2549-2620, 2621-2622, 2655, 2660-2661, 2662-2663, 2664-2665, 2666, 2667, 2668-2670, 2671-2672, 2673-2674, 2678-2682, 2683, 2688-2689, 2690-2695, 2696-2697, 2698, 2699-2708, 2732-2739, 2740-2741, 2742-2743, 2744, 2745-2758, 2759-2760, 2761-2762, 2763-2764, 2765-2767, 2768, 2769, 2819-2820, 2858-2860, 2861-2868, 2869-2870, 2915-2924, 2925-2926, 2927-2928, 2930-2931, 2933-2934, 2935, 2936-2937, 2938, 2939, 2940, 2941, 2942, 2946, 2947-2948, 2976, 2991-2992, 2993-3071, 3072, 3211-3220, 3221-3226, 3435-3436, 3437, 3438, 3439-3442, 3443-3449, 3450, 3451-3453, 3454-3455, 3458-3460, 3461-3462, 3463-3464, 3467-3468, 3469-3471, 3472-3474, 3475, 3476-3479, 3480, and 3509-3511 for *in camera* review.[41] Defendant shall specify the privilege invoked for each withholding or redaction. By April 20, 2010, defendant shall also file (1) a *Vaughn* index that summarizes each document produced *in camera*, identifies each document's author(s), states whether it is responsive to FOIA request Item 5, Item 6, or both, and states whether it is protected by the attorney work product privilege, deliberative process privilege, or both; and (2) an affidavit explaining the role of each document's author(s) within the IRS, the role (if any) played in the deliberative process

---

3rd Cooper Decl. ¶¶ 17-18).

[41] This list consists of 84 discrete documents: 76 for which defendant claimed only the deliberative process privilege, one for which defendant claimed only the attorney work product privilege (Bates numbers 2915-2924), and seven for which defendant claimed both privileges (2696-2697, 2699-2708, 2732-2739, 2745-2758, 2763-2764, 3211-3220, 3221-3226).

by each document or by each document's redacted portions, and whether each document was prepared "in anticipation of" litigation or whether it was prepared "for" litigation. If the affidavit addresses Bates numbers 2422, 2621-2622, 3476-3479, or 3480, then it shall also explain why those documents constitute intra-agency memoranda within the meaning of Exemption 5.

## CONCLUSION

Having considered the pleadings and the entire record herein, and for the foregoing reasons, defendant's motion for summary judgment in granted in part and plaintiff's cross-motion is denied in part with respect to the propriety of withholding or redacting all documents except those specified below. Defendant's motion is denied as to the adequacy of its search and its withholding or redaction of the 39 redacted pages that are responsive to the first IRC request; the unspecified number of withheld emails that are responsive to the second IRC request; the pages identified by control numbers CI090, CI109, CII001, CII0014, CII078-CII099, CII267-268, CII281-282, and CII297-298; and the pages identified by Bates numbers 1882-1883, 1897-1905, 1919, 1926-1930, 1933, 2019, 2422, 2483-2507, 2510-2513, 2516-2524, 2525-2530, 2531-2540, 2541-2543, 2549-2620, 2621-2622, 2655, 2660-2661, 2662-2663, 2664-2665, 2666, 2667, 2668-2670, 2671-2672, 2673-2674, 2678-2682, 2683, 2688-2689, 2690-2695, 2696-2697, 2698, 2699-2708, 2732-2739, 2740-2741, 2742-2743, 2744, 2745-2758, 2759-2760, 2761-2762, 2763-2764, 2765-2767, 2768, 2769, 2819-2820, 2858-2860, 2861-2868, 2869-2870, 2915-2924, 2925-2926, 2927-2928, 2930-2931, 2933-2934, 2935, 2936-2937, 2938, 2939, 2940, 2941, 2942, 2946, 2947-2948, 2976, 2991-2992, 2993-3071, 3072, 3211-3220, 3221-3226, 3435-3436, 3437, 3438, 3439-3442, 3443-3449, 3450, 3451-3453, 3454-3455, 3458-3460, 3461-3462, 3463-3464, 3467-3468, 3469-3471, 3472-3474, 3475, 3476-3479, 3480, and 3509-3511.

By April 20, 2010, defendant shall comply with the separate Order that accompanies this

Memorandum Opinion, which requires defendant to conduct an additional search, produce certain documents for *in camera* review, and file an additional affidavit. The remainder of plaintiff's cross-motion shall be held in abeyance pending the Court's review of defendant's affidavit and *in camera* submissions.

_____/s/_____<br>
ELLEN SEGAL HUVELLE<br>
United States District Judge

DATE: March 12, 2010